## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LARRY SHEMEN AND GARY FELDMAN, Derivatively On Behalf Of STRIDE, INC., (F/K/A K12 INC.), <br><br> Plaintiffs, <br><br> vs. <br><br> AIDA M. ALVAREZ, CRAIG R. BARRETT, GUILLERMO BRON, ROBERT L. COHEN, NATHANIEL A. DAVIS, JOHN M. ENGLER, STEVEN B. FINK, VICTORIA D. HARKER, ROBERT E. KNOWLING, LIZA MCFADDEN, AND TIMOTHY MEDINA, <br><br> Defendants, <br><br> and <br><br> STRIDE, INC. (F/K/A K12 INC.), <br><br> Nominal Defendant. | Case No: <br><br> **JURY TRIAL DEMANDED** |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiffs Larry Shemen and Gary Feldman ("Plaintiffs") allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' (defined below) public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Stride, Inc. (f/k/a K12 Inc.) ("K12" or the "Company"), legal filings, news reports, securities analysts' reports and

advisories about the Company, and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Company's directors and/or officers from April 27, 2020 through the present (the "Relevant Period").

2.     The Company is a Delaware company headquartered in Herndon, Virginia.  The Company is a technology-based education company that provides proprietary and third-party educational curriculum, teacher training, administrative support, information technology support, software systems and educational services. The Company operates virtual learning systems worldwide.  As a provider of online content and educational services, the Company's success and financial and operational wellbeing is critically dependent on its technical capability and ability to provide and maintain well-functioning and operational information technology systems and infrastructures.

3.     Beginning in March 2020, the global pandemic has forced school districts across the country to close in-class instruction and shift all learning activities to online and blended instruction.  The Company saw a unique opportunity to revamp itself by seizing a large stake in the rapidly growing market for online education.  Accordingly, following the nationwide closure of in-class instruction, the Company embarked on an intensive campaign to convince the market that it was well positioned and technologically capable to accommodate and service the massive surge of students, parents, and teachers who were turning to online education.  To do that, the Company disseminated dozens of false and misleading statements in which they touted the

2

technological wherewithal of the Company's online learning platforms, cybersecurity protocols, preparedness for large volumes of students, as well as the administrative support and training that the Company would provide to students, parents, and teachers.

4.      The Company's self-promoting campaign worked well.  In reliance on the Company's false and misleading statements, the market expected the Company to experience a great boost in its financials and successfully capitalize on the opportunities presented to it by the global pandemic.  For instance, on July 15, 2020, when the Company stock traded at around $43, *Citron Research* published a $100 price target for the Company.  *Citron Research*'s prediction was based on its belief that the Company was "best positioned to take advantage of [the] megatrend [of shifting to full online education]."  Also, securities analysts increased the Company's rating, based on the Company's executives' commentary regarding present enrollment trends.  As a result of the Company's self-promoting campaign, the price of the Company's stock increased to a high of $51.60 on August 5, 2020 – an increase that was unmatched by any of the Company's competitors.

5.      However, the Company was not ready to take on the increased load and lacked the technological capabilities to support and service the massive increase in traffic on its website and its learning platforms.  Indeed, the Company lacked adequate infrastructures to enable thousands of students and teachers to logon to their systems and utilize the audio and video features necessary for remote instruction.  Further, despite the Company's representations to the contrary, its cybersecurity measures and protocols were so weak that a 16-year-old high school junior successfully breached the network on which the Company was critically dependent, and thereby crippled its online platform, and the provision of its services for hundreds of thousands of students for several days.  The issues relating to the functionality and support of the Company's platforms were only compounded by the lack of training and instruction provided to teachers and parents,

who received little support and insufficient hands-on experience and training prior to the platform's launch.

6.       Contrary to the facts asserted by the Company, reports began to surface that the Company's training for teachers in Miami-Dade County—one of the nation's largest school districts—had been woefully inadequate.  For instance, on August 26, 2020, teachers in Miami-Dade County School District reported that the training provided by the Company was ineffective and "unacceptable" as they lacked the instruction necessary to utilize the Company's platform.

7.       On this news, the price of the Company stock fell by 7% over the course of two trading days, to close at $37.70 on August 27, 2020.

8.       Once classes began on August 31, 2020, the situation worsened.  The Company experienced major technical issues and disruptions with teachers and students of Miami-Dade County being unable to even log into the platform and utilize its contents, which prompted local officials to publicly scold the Company for being "not ready" for the opening of the school year.  By the third day of classes, September 2, 2020, Miami-Dade County students and teachers reported numerous additional technical issues and a total of twelve intermittent cyberattacks that led to the Company's learning platform effectively being dysfunctional.  In response to the overwhelming amount of complaints by parents, Miami-Dade County School District called a Board meeting to discuss the Company's failures.  During the meeting, Miami-Dade County Public Schools Superintendent Alberto Carvalho revealed that he never signed the $15.3 million no-bid contract with the Company and the school district had never paid the Company for the provision of its services and products.

9.       On this news, the price of the Company's stock dropped 10.5% over the course of two trading days, to close at $34.89 on September 3, 2020.

10.     A week later, after another board meeting that lasted for over 13 hours and included 400 speakers, the Miami-Dade County Public Schools board voted to terminate their $15.3 million contract with the Company on September 10, 2020.

11.     On this news, the price of the Company's stock dropped by 11.5%, to close at $30.55 on September 10, 2020.  Meanwhile, the Beaufort County School District in South Carolina engaged the Company to provide virtual learning programs for their students.  However, the introduction of the program had to be delayed until the second week of instruction.  Soon after, Beaufort County School District board member John Dowling stated that he had lost confidence in the Company's ability to provide educational solutions for the district and moved to terminate the contract, which happened two days later.

12.     On this news, the price of the Company's stock fell 4.9%, to close at $27.21 on September 18, 2020.

13.     Defendants caused the Company to make materially false and misleading statements and failed to disclose material adverse facts about the Company's business, operational, and compliance policies.  Defendants made false and/or misleading statements and failed to disclose to investors that: (i) the Company lacked the technological capabilities, infrastructures, and expertise to support the increased demand for virtual and blended education necessitated by the global pandemic; (ii) the Company lacked adequate cyberattack protocols and protections to prevent the disabling of its computer system; (iii) the Company was unable provide the necessary levels of administrative support and training to teachers, students, and parents; and (iv) based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's business, operations, and prospects and/or lacked a reasonable basis and omitted facts.

## II.     <u>JURISDICTION AND VENUE</u>

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question pertaining to the claims based on violations of the Securities Exchange Act of 1934 (the "Exchange Act") made in the securities class action entitled *Lee v. K12, Inc., et al.*, Case 1:20-cv-01419 (E.D. Va.) ("Securities Class Action").

15.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## III.     PARTIES

### A.     Plaintiffs

18.     ***Plaintiff Larry Shemen*** ("Plaintiff Shemen") is a current shareholder of K12 common stock.  Plaintiff Sheman has continuously held K12 common stock at relevant times and is prepared to hold his K12 stock throughout the duration of this litigation.

19.     ***Plaintiff Gary Feldman*** ("Plaintiff Feldman") is a current shareholder of K12 common stock.  Plaintiff has continuously held K12 common stock at relevant times and is prepared to hold his K12 stock throughout the duration of this litigation.

### B.     Nominal Defendant K12

20.     ***Nominal Defendant K12*** is incorporated in Delaware.  K12's principal place of business is located at 2300 Corporate Park Drive, Herndon, Virginia 20171.

C.      **Director Defendants**

21.      *Defendant Aida M. Alvarez* ("Alvarez") joined the Company as a director in April 2017 and is a member of our Nominating and Corporate Governance Committee.

22.      *Defendant Craig R. Barrett* ("Barrett") joined the Company as a director in September 2010 and serves as Chairman of the Company's Academic Committee.

23.      *Defendant Guillermo Bron* ("Bron") joined the Company as a director in July 2007 and serves as a member of the Company's Nominating and Corporate Governance Committee.

24.      *Defendant Robert L. Cohen* ("Cohen") joined the Company as a director in February 2019 and serves on the Audit Committee and the Academic Committee.

25.      *Defendant Nathaniel A. Davis* ("Davis") joined the Company as a director in July 2009 and has served as the Company's Chairman since June 2012.  In January 2013, Defendant Davis became the Company's Executive Chairman, and in January 2014, Defendant Davis was appointed to be the Company's CEO, serving in that role through February 2016 and again beginning in March 2018.  Defendant Davis is a defendant in the Securities Class Action.

26.      *Defendant John M. Engler* ("Engler") joined the Company as a director in October 2012 and is a member of the Compensation Committee, Nominating and Corporate Governance Committee and Academic Committee.

27.      *Defendant Steven B. Fink* ("Fink") joined the Company as a director in October 2003 and serves as Chairman of the Company's Audit Committee and is a member of the Compensation Committee.

28.      *Defendant Victoria D. Harker* ("Harker") joined the Company as a director in April 2020 and is a member of the Audit Committee.

29.     **Defendant Robert E. Knowling** ("Knowling") joined the Company as a director in January 2018 and is the Chairman of the Compensation Committee.

30.     **Defendant Liza McFadden** ("McFadden") joined the Company as a director in August 2017 and serves as Chairman of the Nominating and Corporate Governance Committee.

31.     Defendants Alvarez, Barrett, Bron, Cohen, Davis, Engler, Fink, Harker, Knowling and McFadden are collectively referred to herein as the "Director Defendants."

**D.     <u>Officer Defendants</u>**

32.     **Defendant Timothy Medina** ("Medina") has served as the Company's CFO since his appointment in April 2020.  Defendant Medina is a defendant in the Securities Class Action.

33.     The Director Defendants and Defendant Medina are collectively referred to herein as "Defendants".

<u>**AUDIT COMMITTEE CHARTER**</u>

34.     According to the Audit Committee Charter, the responsibilities of the Audit Committee are:

**Duties and Responsibilities**

**Interaction with the Independent Auditor**

1.     Appointment and Oversight. The Committee shall be directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor shall report directly to the Committee.

2.     Pre-Approval of Services. Before the independent auditor is engaged by the Company or its subsidiaries to render audit or non-audit services, the Committee shall preapprove the engagement. Committee pre-approval of audit and non-audit services will not be required if the engagement for the services is entered into pursuant to pre-approval policies and procedures established by the Committee regarding the Company's engagement of the

independent auditor, . The Committee may delegate to one or more designated members of the Committee the authority to grant pre-approvals, provided such approvals are presented to the Committee at a subsequent meeting. If the Committee elects to establish pre-approval policies and procedures regarding non-audit services, the Committee must be informed of each non-audit service provided by the independent auditor. Committee pre-approval of non-audit services (other than review and attest services) also will not be required if such services fall within available exceptions established by the SEC.

3.      Independence of Independent Auditor. The Committee shall, at least annually, evaluate the independence and quality control procedures of the independent auditor and the experience and qualifications of the independent auditor's senior personnel that are providing audit services to the Company. In conducting its evaluation:

(i)      The Committee shall obtain and review a report prepared by the independent auditor describing (a) the auditing firm's internal quality-control procedures and (b) any material issues raised by the most recent internal quality-control review, or peer review, of the auditing firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the auditing firm, and any steps taken to deal with any such issues.

(ii)     The Committee shall discuss with the independent auditor its independence from the Company, and obtain and review a written statement prepared by the independent auditor describing all relationships between the independent auditor and the Company, consistent with "PCAOB Rule 3526, Communications with Audit Committees Concerning Independence" or any successor as then in effect, and consider the impact that any relationships or services may have on the objectivity and independence of the independent auditor.

(iii)    The Committee shall confirm with the independent auditor that the independent auditor is in compliance with the partner rotation requirements established by the SEC.

(iv)     The Committee shall, if applicable, consider whether the independent auditor's provision of any permitted information technology services or other non-audit services to the Company are compatible with maintaining the independence of the independent auditor.

## IV.    **BACKGROUND**

35.     The Company is a technology-based education company that provides proprietary

and third-party educational curriculum, software systems and educational services designed to facilitate individualized learning for students, the majority of which are in kindergarten through 12th grade, or K-12.  The Company primarily targets virtual and blended public schools, school districts, charter schools, and private schools that utilize varying degrees of online and traditional classroom instruction, and other educational applications.  The overwhelming majority, almost 90%, of K12's revenue comes from contracts with managed public school programs.

36.     Since April 2019, the Company experienced a steady decline in the price of its common shares caused by disappointing performance metrics, including reporting significantly higher net losses than expected and decreasing net income.  In fact, between April 2019 and February 2020, the price of K12 stock declined from approximately $37 on April 16, 2019 to $15.86 on February 10, 2020, a decline of more than 57% over the course of ten months.

37.     While the COVID-19 pandemic ravaged many industries, due to the overall shift to blended and remote learning, K12's prospects seemingly began to improve. Around March 2020, nearly all elementary and high schools nation-wide shifted to virtual operation. Online learning providers, like K12, saw a boom in enrollment as parents and educators sought an alternative to the traditional classroom setting. K12 was presented with a unique opportunity to leave its struggles in the past and revamp itself into the nation's leading provider of online curriculum and other educational services.  In its effort to seize as much of the market as possible prior to the opening of the new school year in September 2020, the Company embarked on a months-long intensive campaign to convince the school districts of its preparedness and technical wherewithal to service the unprecedented surge of online students.

38.     As a result of the Company's aggressive public self-promoting campaign, the misrepresented material facts and omissions, the Company's stock price reached an all-time high

during the pandemic, closing at $51.60 on August 5, 2020, representing a 106% increase in the price of its shares.   Unlike the Company, its competitors fared worse, experiencing a more moderate increase in the price of their shares. For example, Rosetta Stone experienced approximately 71% increase while Pluralsight experience 40% increase.

## V.   FALSE AND MISLEADING STATEMENTS

39.   On April 27, 2020, the Company issued a press release reporting its financial results for the third fiscal quarter ended March 31, 2020.  In the press release, Defendant Davis touted the Company's "core competency" in aiding schools and school districts operation of their online programs:

> Looking forward, K12 now sits squarely in the middle of one of the most important changes in our society – distance and digital learning will become an even more important part of how our children learn.  ***Our core competency in helping public school districts, private schools, and charter schools operate their online programs positions us well given how the education market is likely to change***. [Emphasis added].

40.   On that same day (April 27, 2020), the Company filed its quarterly report on SEC Form 10-Q for the third fiscal quarter 2020 ("3Q 2020 Report").  In that 3Q 2020 Report, the Company described their capabilities, including the provision of learning systems for varying degrees of online learning:

> The Company's learning systems combine curriculum, instruction and related support services to create an individualized learning approach.  ***The Company's learning systems are well-suited for virtual and blended public schools, school districts, charter schools, and private schools that utilize varying degrees of online and traditional classroom instruction, and other educational applications***.
>
> * * *
>
> The Company works closely as a partner with public schools, school districts, charter schools, and private schools, enabling them to offer their students an array of solutions, including full-time virtual programs, semester courses and supplemental solutions. In addition to curriculum, systems and programs, the

***Company provides teacher training, teaching services, and other academic and technology support services***. [Emphasis added].

41.     With regard to the managed public-school programs, which represents 89% of the Company's total revenue — the 3Q 2020 Report again provided assurances that the Company offers administrative support and information technology to support the range of products the Company offers to its customers:

> ***The Company provides an integrated package of systems, services, products, and professional expertise that we administer to support an online or blended public school***. Contractual agreements generally span multiple years with performance obligations being isolated to annual periods. ***Customers for these programs can obtain the administrative support, information technology, academic support services, online curriculum, learning systems platforms and instructional services under the terms of a negotiated service agreement.*** The schools receive funding on a per student basis from the state in which the public school or school district is located. Shipments of materials for schools that occur in the fourth fiscal quarter and for the upcoming school year are recorded in deferred revenue. [Emphasis added].

42.     In the sections of the 3Q 2020 Report, under the heading of "Risks and Uncertainties" and "Risk Factors," the Company did not adequately disclose risks relating to cybersecurity, data privacy, data breaches, or potential technological weaknesses and vulnerabilities of its platform.  In fact, the Company's 3Q 2020 Report never once mentioned cyber security, data breaches, or information security as one of the very real risks that the Company was facing.  These omissions were material.

43.     Appended as Exhibits 32.1 and 32.2 to the 3Q 2020 Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants Davis and Medina certified that "the [3Q 2020 Report] fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934," and that "the information contained in the [3Q 2020 Report] fairly presents, in all material respects, the financial condition and result of operations of the Company."

12

44.     On the same day, the 3Q 2020 Report was filed (April 27, 2020), the Company held an earnings call with analysts to discuss the Company's financial results and operations. During the earnings call, Defendant Davis touted the Company's financial results, including the fact that the Company "beat [its] estimates across the board: revenue, adjusted operating income and capital expenditures" which according to him was a result of the "***ongoing strength of [K12's] core business[.]***" As to the Company's technical abilities, Defendant Davis assured investors that the transition from physical to online learning was flawless for other Company customers:

> The pandemic has disrupted academic plans and goals for so many students across the U.S. and across the globe.  All brick and mortar schools closed in the U.S. and it was a scramble by many to figure out just how does this virtual schooling thing work. However, ***the academic experience for most K12 powered programs was essentially school as usual.***  [Emphasis added].

45.     Further, Defendant Davis made courageous claims regarding K12's readiness and technical abilities to service and administer the sudden surge of online students caused by the pandemic:

> Let's talk about the upsides of the pandemic in our business.  As I've already said, it's horribly unfortunate for so many people all around the world.  ***But we're in the business that helps schools and students in situations exactly like this.***  When the pandemic first started to impact brick and mortar schools, ***our phones begin to ring off the hook and we saw a sharp increase in traffic on our website.  We reached nearly 1 million unique visitors to the k12.com website in February and March, which is a 49% increase year-over-year***.  Many of those visitors built out lead submission forms.  In fact more than 100,000 lead submission forms were completed by parents in the last 2 month [sic], a 57% increase over the same time last year.  [Emphasis added].

46.     As to the Company's technical support of the thousands of new students whose school districts shifted to virtual learning, Defendant Davis highlighted the Company's efforts in providing solutions supporting and servicing the impacted communities:

> Our company has also stepped up in support of communities that were impacted by the nationwide school closures.  This includes offering free online curriculum, platforms, training and technical assistance to students, their families and to school

districts.  We're also offering free webinars on best practices for teachers and families, who have been thrust into an online environment for the very first time. ***To date nearly 70,000 students, teachers and families have signed up for these programs and webinars. These efforts continue to raise interest in and awareness of the blended and online classroom and of K12's expertise in this area***.

***Lastly, we're also working closely with dozens of school districts on solutions that will help them educate students remotely***.  Some school districts are already using our curriculum under the 30-day free offer, I mentioned.  Others are using our supplemental content, such as Stride and Big Universe.  Many are using a mixture of both.  So far more than 30,000 students are being supported by these promotional programs in the current school year.  ***We believe a larger longer-term opportunity exists as districts figure out just how they will incorporate online learning into their regular curriculum and enter this full continuity plan***.  [Emphasis added].

47.     During the Q&A portion of the earnings call, Defendant Davis also assured investors of the Company's strength.  When asked about the time it takes to establish a new school with the Company's system, Davis said that COVID-19 was "***a positive tailwind***" that is putting the onus on the school system, saying that "states come to us and say, hey, can we do something here?"  He went even further, professing that online school programs are the way forward if schools "want to be in a position to be able to help students and help your community and help your state."  To this end, Defendant Davis made investors aware of ongoing negotiations and the Company's bidding process with a "couple of very large school districts" and "two large cities."

48.     Defendant Davis also discussed the increased demand from school districts for the Company to "train[] their teachers in district schools and how to teach an online environment and how to put a full program in place," which the Company planned to meet by providing "training, professional development of teachers, who can learn how to teach in an online environment. . . ."

49.     Defendant Medina echoed these sentiments, saying that the Company's "core business continues to perform well and the increased awareness of our virtual options positions [K12] for accelerating growth over the long-term."  Defendant Medina also took the time to assure investors of the Company's continued success, stating:

14

***K12 is very well positioned to grow in spite of the uncertainty in the general economy***.  We are in a strong financial position and have a solid balance sheet with a strong cash position. States have committed to fund public schools during the crisis and we are seeing increased demand for our services.  ***We believe the effects of COVID-19 will be a lasting tailwind to online education and especially the K12's business model***.  [Emphasis added].

50.     On July 6, 2020, Miami-Dade County Public Schools announced their reopening plan, which involved the use of the Company's online learning platform, "My School Online." The online instruction was offered as an option for families who wanted an alternative to face-to-face instruction due to medical issues in a students' household.  Parents who decided to utilize this option were told that their children would receive "the same quality education as in a face-to-face setting," including "high quality course materials," and daily meetings with teachers over "web conferencing technology."

51.     On July 15, 2020, *Citron Research* published a report projecting that the Company's shares would reach $100 based on the Company's opportunity to capitalize on the global pandemic, which *Citron Research* called the "the ultimate tailwind" for the Company. Notably, *Citron Research*'s report quoted several of Defendant Davis' statements during the April earnings call, where he concluded that the Company was the company best positioned to take advantage of the spike in demand for online education.  Other analysts likewise cited Defendant Davis' comments and uniformly revised the Company's price target upward or recommended that investors buy the Company's stock.

52.     On August 11, 2020, the Company issued a press release reporting its financial results for the fourth fiscal quarter and full fiscal year ended June 30, 2020.  In it, Defendant Davis highlighted the purportedly smooth operations of the Company's platform, stating "[t]he schools we support did not experience disruption, and we are thankful to have graduated more than 8,000 students this year[.]"   In addition, Defendant Davis assured the market of the Company's

preparedness for increased enrollment in the upcoming school year:

> Managed public school enrollments are already 150 thousand, as of August 7th, and we are entering what has historically been the busiest part of our enrollment season. ***We are therefore positioned to deliver double-digit growth in both revenue and adjusted operating income in the coming year***. This is only an early estimate and not formal guidance. [Emphasis added].

53.     On the same day, August 11, 2020, the Company held an earnings call to discuss the Company's financial results and operations.   During the earnings call, Defendant Davis bragged about the Company's contract with one of nation's largest public schools, Miami-Dade County Public Schools, reiterating the Company's readiness to service and administer online learning programs for large public school systems, remarking as follows:

> K12 will provide customized services [to Miami-Dade County Public Schools] including curriculum, assessment tools, teacher training and data management. ***This will ensure a strong start to the new year for both educators and Miami-Dade's more than 270,000 students that we'll serve***.
>
> ***Teachers already employed by Miami-Dade will combine their great teaching with our technology and expertise by high quality inspection and a safe environment.*** This allows Miami-Dade to retain both teacher jobs and the all-important existing student teacher relationship. An alignment with their existing learning goals, Miami-Dade Public school teachers and administrators can also customize the online curriculum we'll provide including core subjects and hundreds of lessons. ***This shows the flexibility of the K12 technical platform.***
>
> We're thrilled to support Superintendent Carvalho and the innovative solutions he and his team have designed. ***This is just one example of how a large school district can rise to meet the unprecedented challenges, school closures caused by the COVID-19 pandemic.*** We'll work with another school districts on their own customized solutions for the fall as well. ***And we stand ready to support schools and school districts of any size during this critical time.*** [Emphasis added].

54.     Defendant Davis closed his prepared remarks by stating that the Company is "in the right market at the right time with the right experience and technology to take advantage of a large addressable market."  Further, in response to an analyst's question regarding teacher hiring and training, Defendant Davis stated:

[O]ur program has a standard set of training that we've honed over many years, and it only takes them about two weeks to go through the training. . . .  What they need to know is what's the beginning of the content in the program. And as the students are learning throughout the year, the teachers are also getting more and more familiar with it.  *So we've got professional development sessions for all the new teachers to get them through their first couple of weeks of training and then we will continue that development all throughout the year.*  [Emphasis added].

55.     Defendant Medina added that the Company's "core business and our growing Career Learning business put us in a strong position going into fiscal 2021.  *We are making investments now to ensure that we can serve all the families who choose to attend a K12-powered school*."

56.     Stock analysts reacted positively to these statements on the earnings call.  For instance, William Blair analyst Stephen Sheldon, an analyst who participated in the earnings call reiterated an "Outperform" rating on the Company, noting that the Company's "[m]anagement spoke very positively about enrollment trends heading into fiscal 2021[.]"

57.     On August 12, 2020, the Company filed its Annual Report on SEC Form 10-K for the fiscal year ended June 30, 2020 ("2020 Annual Report").  The Director Defendants signed the 2020 Annual Report.  In the 2020 Annual Report, the Company described itself as "an innovator in K-12 online education" with purportedly "distinctive core competencies that allow us to meet the varied needs of our school customers and students[, including] our ability to create engaging curriculum, train teachers in effective online instruction, [and] provide administrative support services to online schools . . . . "

58.     As to the Company's readiness to service Managed Public School Programs, which comprise nearly 90% of the Company's revenue, the 2020 Annual Report gave assurances of support provided by K12 to public schools:

These programs offer an integrated package of systems, services, products, and professional expertise that we administer to support an online or blended public

school, including: administrative support (*e.g.*, budget proposals, financial reporting, student data reporting, and staff recruitment), information technology and provisioning, academic support services, curriculum, learning systems, and instructional services.

59.     The 2020 Annual Report also emphasizes the Company's technological expertise, stating that their "areas of focus" include, among other things, "***making sure that all of our systems and solutions are easy for teachers, administrators, students, and parents to use" and providing a "virtual learning platform which supports the scheduling and delivery of instruction tracking of attendance, recording of instructional sessions, and allows student group work***."  Similarly, the Company's "Educational Philosophy" confirms that "students learn better not just with great curriculum, but also great teachers and technology that allows them to access the content and teachers in a way that makes learning more engaging and effective."

60.     Importantly, the Company affirmatively represented the cybersecurity policies, protocols, and internal controls it purportedly had in place, including firewall technology, and encryption methods to safeguard against data breaches, stating as follows:

> Cybersecurity. Our cybersecurity measures and policies include dividing application layers into multiple zones controlled by firewall technology. Sensitive communications are encrypted between client and server and our server-to-server accessibility is strictly controlled and monitored.  We have contracted with an outside network and information cybersecurity firm to assist us with monitoring traffic and potential threats that may target our services and systems.  ***We protect sensitive information through policy and control governance that is validated on a semi-annual basis, and maintain a layered security architecture. Third-party firms are engaged to test our networks, servers and applications for vulnerabilities***.  We have prepared an incident response plan that is designed to escalate information regarding material data breaches and cybersecurity attacks to the senior management of the Company.  A business-centric information security program has also been adopted that is tailored to adjust to an ever-changing IT compliance and information security threat landscape. Although distributed denial-of-service attacks are frequently attempted, we have not experienced a significant disruption to our business as a result of these attacks.  [Emphasis added].

61.     Unfortunately for the investing public, the Company's risk disclosures contained

only minimalistic boilerplate statements, which merely communicated the possibility that the Company's systems could experience cybersecurity attack or breach, by certain "more sophisticated" hackers.  These same purported risk disclosures where accompanied by additional assurances regarding the safety of the Company's systems and databases, including affirmative statements that "***K12 dedicate[s] personnel and resources to maintain multiple levels of protection to minimize the risk of a cybersecurity attack, malware intrusion or breach***."

62.     Appended as Exhibits 32.1 and 32.2 to the 2020 Annual Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants Davis and Medina certified that "the [Annual Report] fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934," and that "the information contained in the [Annual Report] fairly presents, in all material respects, the financial condition and results of operations of the Company."

63.     As a result of Defendants' false and misleading statement, the price of the Company's securities skyrocketed to its all times high of $51.60 on August 5, 2020, representing a 106% surge

64.     The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (i) the Company lacked the technological capabilities, infrastructures, and expertise to support the increased demand for virtual and blended education necessitated by the global pandemic; (ii) the Company lacked adequate cyberattack protocols and protections to prevent the disabling of its computer system; (iii) the Company was unable provide the necessary levels of administrative support and training to teachers, students, and parents; and (iv) based on the

foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's business, operations, and prospects and/or lacked a reasonable basis and omitted facts.

## THE TRUTH BEGINS TO EMERGE

65.    On August 26, 2020 — two weeks after the Company made unsubstantiated claims about its readiness to service and support the public school system of Miami-Dade County—reports began to surface that teachers in the Miami-Dade County school system were extremely unprepared for the new school year because they were unfamiliar with the Company's learning platform, and lacked "hands-on experience" and "adequate training for [K12's online learning platform]." The United Teachers of Dade President Karla Hernandez-Mats ("UTD President Hernandez-Mats") issued a statement, in which she disclosed that the "***the training for K12 has been ineffective and the time allotted to learn it has been unacceptable***."

66.    On this news, the price of the Company's stock fell 7% over the course of two trading days, to close at $37.70 on August 27, 2020.

67.    On August 31, 2020—the first day of the school year—the Company's online platform experienced major technical issues and disruptions that prevented students and teachers from successfully logging into the platform and utilizing its contents.  Instead of seeing the educational curriculum and starting the new school year, users of the Company's platform received an error message, informing them that "[t]oo many people are online right now."  UTD President Hernandez-Mats squarely put the blame on the Company.  UTD President Hernandez-Mats issued a formal statement in which she publicly scolded the Company for failing the entire school system, including education professionals, students, and parents, stating that K12's platform was "***not ready***" and that the Company was "***in over their head***."

68.    By the third day of classes, September 2, 2020, Miami-Dade County public school

students and teachers reported numerous technical issues and a total of twelve intermittent cyberattacks that hindered educational efforts. Alarmingly, one of the cyber-attacks was committed by a 16-year-old high school junior who managed to disable the school's network system on which the Company was critically dependent for the provision of its service. The 16-years-old student admitted to breaching the network by using a simple tool that industry experts described as a "decade-old, open source tool that most bare-bones firewall software can catch." For instance, Barrett Lyon, the CEO of cybersecurity firm Netography, noted that the tool required no hacking experience and was the "modern-day equivalent" of pulling the fire alarm.

69.     The Company knew that it was dependent on the proper functioning of the Miami-Dade County School District's network, yet took no steps to secure its network, or to maintain meaningful alternatives that would have enabled K12 to continue to provide its services via alternative means or otherwise mitigate the potential risk of its service being disabled. The breach of Miami-Dade County School District's network thereby exposed K12's inadequate and insufficient protocols relating to cybersecurity threats and the lack of mitigation measures to ensure the proper functioning of its own systems.

70.     These perpetual technical problems, and issues with connectivity and audio and video use, triggered an overwhelming amount of complaints from teachers, students, and parents to the officials of Miami-Dade County School District. In response to the outrage from families and students unable to access and utilize the educational curriculum, the Miami-Dade County School Board called a Board meeting to discuss the many failures of the Company online platform. During the Board meeting, Miami-Dade County Public Schools Superintendent Alberto Carvalho revealed that he never signed the $15.3 million no-bid contract with the Company and the school district never paid the Company for the provision of its services and products. During the same

Board meeting, officials revealed that the Company admitted that its problems were not limited to Miami-Dade County, and instead, the Company "had some sporadic issues with other schools."

71.     On this news, the price of the Company stock sharply fell by 10.5% over the course of two trading days, to close at $34.89 on September 3, 2020. The Company's stock price has continued to decline.

72.     Unfortunately for the students and teachers in Miami-Dade County, the numerous issues with the Company continued into the second week of classes.  Miami-Dade County students reported that teachers and students could not see or hear each other and could not access the educational curriculums.  Furthermore, many students reported that the content had been deleted while users were booted from the program, leading some students to be falsely marked as absent. The number of cyberattacks during the first week grew to at least twenty-five.

73.     On September 9, 2020, in response to the ongoing issues with the Company platform, the Miami-Dade County School Board called a Board meeting, which lasted 13 hours and featured 400 public speakers.  Parent complaints about the Company were wide-ranging, including: (i) curriculum that was not age-appropriate; (ii) references to materials that the District had not purchased which made the existing materials "useless;" (iii) lack of support for students with special needs; (iv) insufficient training and time to prepare; and (v) an unreliable system. Consistent with the parents' complaints, teachers referred to the Company curriculum as "sub-par."  In a letter to the Miami-Dade County School Board, Defendant Davis acknowledged that "[t]he platform . . . needed more work and clearly did not handle Miami-Dade's requirements." The Miami-Dade County School Board meeting culminated in the Board's vote on September 10, 2020, to stop using the Company's online learning platform.

74.     On this news, the price of the Company stock plummeted further by 11.5% to close

at $30.55 on September 10, 2020.

75.     The Company's problems were not limited to Miami-Dade County.   On September 15, 2020, within a week of the start of classes, the Beaufort County School Board began to consider the cancellation of its own $2.75 million contract with the Company.   In making a motion to terminate the contract, Board member John Dowling ("Dowling") stated that "the senior staff has lost any confidence at all" in the Company.   A district spokesperson also disclosed that the district had not yet made any payments to the Company pursuant to the contract.

76.     On September 17, 2020, after the Beaufort County School Board discussed the contract in an executive session, Dowling moved to terminate the Company's contract, "recognizing the fact that contractual obligations were not met."   The Board voted unanimously to terminate the K12 contract.   In a statement after the vote, Superintendent Frank Rodriguez cited his disappointment in the Company's ability to meet the Board's expectations and fulfill its requirements under the contract.

77.     On this news, the price of the Company stock dropped by 4.9%, to close at $27.21, on September 18, 2020.

## VI.     CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

78.     In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.   Defendants caused the Company to conceal the true facts as alleged herein.   Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

79.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise Defendants' violations of law,

including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets.

80. Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  In furtherance of this plan, conspiracy, and course of conduct, Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each Defendant, who are directors of K12, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

81. Each Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

82. At all times relevant hereto, each Defendant was the agent of each of the other Defendants and of K12 and was at all times acting within the course and scope of such agency.

## VII. DAMAGES TO THE COMPANY

83. As a direct and proximate result of Defendants' conduct, the Company has lost and expended, and will lose and expend, many millions of dollars.

84. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of its current and former officers, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

85.     As a direct and proximate result of Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and Defendants' breaches of fiduciary duties and unjust enrichment.

## VIII.   DERIVATIVE ALLEGATIONS

86.     Plaintiffs bring this action derivatively and for the benefit of the Company to redress injuries suffered, and to be suffered, as a result of Defendants' breaches of their fiduciary duties as directors and/or officers of the Company, waste of corporate assets, and violations of the Exchange Act, as well as the aiding and abetting thereof.

87.     The Company is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

## IX.   DEMAND FUTILITY ALLEGATIONS

88.     Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

89.     A pre-suit demand on the Board of the Company is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following ten (10) individuals: Defendants Alvarez, Barrett, Bron, Cohen, Davis, Engler, Fink, Harker, Knowling and McFadden (the "Director Defendants").  Plaintiffs need only to allege demand futility as to five of these ten Directors.

90.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material.

91.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors.  As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

**<u>Defendant Davis</u>**

92.     Defendant Davis, the Company's CEO, is not an independent director.  Defendant Davis is not disinterested for purposes of demand futility because his principal occupation is CEO of the Company.

93.     Defendant Davis is also incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

**<u>Defendants Cohen, Fink and Harker</u>**

94.     Defendants Cohen, Fink and Harker served on the Company's Audit Committee during the Relevant Period.  Pursuant to the Company's Audit Committee Charter, the Audit Committee members were responsible for overseeing the Company's financial reporting process, the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, and the Company's internal controls over financial reporting.  The Audit Committee failed to ensure the integrity of the Company's financial statements, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls.  Therefore, these Defendants (as members of the Audit Committee) breached their fiduciary duties, are not disinterested, and demand is excused as to them.

**Defendants Alvarez, Barrett, Bron, Cohen, Davis,**
**Engler, Fink, Harker, Knowling and McFadden**

95.     Defendants Alvarez, Barrett, Bron, Cohen, Davis, Engler, Fink, Harker, Knowling and McFadden knowingly and consciously allowing the authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Defendants Alvarez, Barrett, Bron, Cohen, Davis, Engler, Fink, Harker, Knowling and McFadden face a substantial likelihood of liability. If Defendants Alvarez, Barrett, Bron, Cohen, Davis, Engler, Fink, Harker, Knowling and McFadden were to bring a suit on behalf of K12 to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason demand is futile as to Defendants Alvarez, Barrett, Bron, Cohen, Davis, Engler, Fink, Harker, Knowling and McFadden.

**X.     CAUSES OF ACTION**

<u>**COUNT I**</u>

**(Against Defendants Davis And Medina For Contribution Under**
<u>**Sections 10(b) And 21D Of The Exchange Act)**</u>

96.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

97.     The Company, along with Defendants Davis and Medina, is named as a defendant in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  If

and when the Company is found liable in the Securities Class Action for these violations of law, the Company's liability will be in whole or in part due to Defendants Davis and Medina's willful and/or reckless violations of their obligations as an officer and directors of the Company.

98.     Through their positions of control and authority as an officer and directors of the Company, Defendants Davis and Medina were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts described in the Securities Class Action and herein.

99.     As such, Defendants Davis and Medina are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

## COUNT II

### (Against Defendants For Breach Of Fiduciary Duties)

100.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

101.     Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of K12's business and affairs.

102.     Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

103.     Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.  Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of K12.

104.     Defendants failed to correct and/or caused the Company to fail to rectify any of

the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

105.     In further breach of their fiduciary duties, Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

106.     Plaintiffs, on behalf of K12, have no adequate remedy at law.

**COUNT III**

**(Against Defendants For Waste Of Corporate Assets)**

107.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

108.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused K12 to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, and to lose financing from investors and business from future customers who no longer trust the Company and its products.  As a result of the waste of corporate assets, Defendants are each liable to the Company.

109.     Plaintiffs, on behalf of K12, have no adequate remedy at law.

**XI.     REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to

protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## XII.   DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on all issues so triable.

Dated: December 21, 2020

**O'KELLY & ERNST, LLC**

_/s/ Ryan M. Ernst_
Ryan M. Ernst (#4788)
824 N. Market Street, Suite 1001A
Wilmington, DE 19801
Telephone: (302) 778-4000
Email: rernst@oelegal.com

_Attorneys for Plaintiffs_

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY  10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

_Attorneys for Plaintiffs_